USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/2/2026___

---

AFAB INDUSTRIAL SERVICES, INC.,

                   Plaintiff,

          -against-

LITTLE CHELSEA, INC. d/b/a CHELSEA EXLUSIVE,

                   Defendant.

---

LITTLE CHELSEA, INC. d/b/a CHELSEA EXLUSIVE,

                   Third-Party Plaintiff,

          -against-

VDAN SALES INC.,

                   Third-Party Defendant.

---

23-CV-03095 (MMG)

**OPINION & ORDER**

---

MARGARET M. GARNETT, United States District Judge:

This is a Lanham Act lawsuit. Plaintiff is AFAB Industrial Services, Inc. ("AFAB"), a manufacturer and distributor. Defendant is Little Chelsea, Inc. doing business as Chelsea Exclusive ("LCI"), a retail store in Manhattan. Third-party Defendant is VDAN Sales Inc. ("VDAN"), a wholesaler and authorized distributor of AFAB products. AFAB contends that LCI sold a counterfeit of its trademarked product "Maximum Impact," an ethyl chloride solution in an aerosol canister. LCI argues it did not sell any counterfeit goods or, if it did, then they came from VDAN. VDAN argues that the goods were not counterfeit or did not come from VDAN. A bench trial occurred from February 9, 2026, to February 12, 2026. Having carefully considered the evidence and the Court's first-hand observations of the witnesses, the Court concludes that AFAB has not carried its burden of proving that the goods in question are

1

counterfeit.  The Court will therefore enter judgment in favor of LCI and dismiss the claims against VDAN.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

**I.      BACKGROUND[1]**

Understanding this case requires two pieces of background.  First, sex shops nationwide sell a variety of nitryl-based inhalants popularly known in the gay community as "poppers." *Inhalants*, NYC HEALTH, https://www.nyc.gov/site/doh/health/health-topics/inhalants.page (last visited Feb. 16, 2026).  Poppers are commonly inhaled prior to or during sexual acts.  And the purported aerosol cleaner "Maximum Impact" is well known as a popper.  *See, e.g., id.*[2]

Second, this case since its inception has proceeded in the shadow of a State-court wrongful death action brought by a widower named Ravi Gopaul against LCI and AFAB stemming from the untimely death of Ravi's husband, Steven Gopaul.  Ravi Gopaul arrived home on May 22, 2019, and found Steven unresponsive on their bed with a rag in his mouth and a canister of Maximum Impact at his side.  Paramedics arrived and took Steven to the hospital. He died several days later.[3]  Ravi then discovered a second, partially-used canister of Maximum Impact in Steven's bedside drawer.

Two years later, in April 2021, Ravi Gopaul sued LCI and AFAB in New York Supreme Court.  *See* AFAB-10.[4]  He alleged that, although both LCI and AFAB knew how people were

---

[1] The below is based on evidence in the record and the testimony of the witnesses.

[2] Although the trial participants at times danced around this reality, and the owner of AFAB purported to view this as "misuse" of a product intended as a "cleaning solvent," that testimony was not credible, as discussed further below.

[3] To avoid confusion, the Court sometimes refers to Ravi Gopaul or Steven Gopaul using their first names.  The Court means no disrespect to either individual.

[4] The trial exhibits consist of joint trial exhibits (cited as "J-" followed by the exhibit number), AFAB's exhibits (cited as "AFAB-" followed by the exhibit number) and LCI's exhibits (cited as "LCI-" followed by the exhibit number).  These exhibits numbers are taken from Final Exhibit List available at

using Maximum Impact, they did nothing to curb that use. *Id.* On being served with process in the state case, LCI's owner Michael Ohana and its manager Dominguez Fernando threw all the Maximum Impact in their inventory into the garbage as well as all their other poppers products. *See* Dkt. No. 42.

On April 13, 2023, AFAB commenced this Lanham Act case against LCI. *See* Dkt. No. 1. The complaint includes one count of "Trademark Infringement/False Designation of Origin/False Description/Counterfeiting/Unfair Competition" in violation of 15 U.S.C. §§ 1114 and 1125(A). *Id.* Over the course of litigation, however, AFAB has clarified that it is advancing solely on the theory that LCI sold Steven Gopaul the two canisters of Maximum Impact found in his bedroom, and that both canisters are counterfeit versions of the genuine AFAB Maximum Impact product. *See* Dkt. No. 42. LCI impleaded one of its Maximum Impact distributors, VDAN, and argued that VDAN was also liable if LCI had in fact sold counterfeit Maximum Impact. Dkt. No. 15.[5]

## II.    THE BENCH TRIAL

Certain facts were not disputed, or cannot seriously be disputed, based on the evidence adduced at trial. Ohana and Fernando previously worked at a retail establishment called the "Blue Store" that sold, among other products, Maximum Impact. The Gopauls were customers of the Blue Store and knew Fernando as an employee there. The Gopauls developed a friendly

---

Dkt. No. 105. The parties submitted a revised exhibit list to the Court the morning of February 12, 2026, including the exhibits relied on at trial or exhibits that either party sought to admit into the record (the "Revised Exhibit List"). The Revised Exhibit List is attached to this Opinion as Attachment A. On the record on February 12, 2026, the Court admitted all the exhibit on the Revised Exhibit List into the record.

[5] For a significant period of the litigation, all parties operated under the premise that VDAN was LCI's only documented supplier of Maximum Impact. In late 2024, however, additional documents revealed that LCI was also purchasing Maximum Impact from another authorized wholesaler, E & A Video, as discussed further below. E & A Video is not a party to this case.

professional relationship with Fernando as one of their go-to salespersons at the Blue Store. Ohana decided to leave the Blue Store to start LCI, and asked Fernando to come with him to help with that project. Fernando left the Blue Store around November 2017. LCI opened in March 2018. It is a small retail store in the Chelsea neighborhood of Manhattan that sells men's clothing, accessories, and adult novelty items. The Gopauls followed Fernando and became customers of LCI. Like the Blue Store, LCI sold Maximum Impact.

AFAB holds a trademark for "Maximum Impact." The trademark covers use of the Maximum Impact name for a sexual lubricant, "body paint," "energy" pills, and the purported "aerosol cleaner" at issue in this case. AFAB also manufactures the Maximum Impact "aerosol cleaner," which is an ethyl chloride solution in a 4-ounce aerosol canister (this use of the mark is what will be referred to in this opinion as "Maximum Impact"). Third-party Defendant VDAN and non-party E & A Video were two of AFAB's authorized Maximum Impact wholesale distributors. They both sourced Maximum Impact exclusively from AFAB and they both sold Maximum Impact to LCI. LCI sold Maximum Impact to its retail customers, including Ravi and Steven Gopaul.

Finally, on May 22, 2019, Ravi Gopaul found his husband Steven Gopaul unresponsive in their bedroom. Steven had a rag in his mouth and an empty (or near-empty) canister with the Maximum Impact name near him on the bed. Steven was taken to the hospital by paramedics and died several days later without resuming consciousness. Shortly after Steven was taken to the hospital, Ravi Gopaul found a second identical canister with the name Maximum Impact in Steven's bedside drawer. These two canisters were admitted at trial as J-19 and J-20, and are the canisters that AFAB claims are counterfeit and were sold by LCI.

4

With this background, the bench trial focused on two key disputed issues.  First, were the two canisters labeled Maximum Impact found near Steven Gopaul counterfeit?  Second, did Steven Gopaul purchase those canisters at LCI?  Given VDAN and E & A Video were authorized Maximum Impact suppliers that sourced from AFAB, AFAB also argued that LCI had an unknown source of Maximum Impact besides either VDAN or E & A Video.  Lastly, AFAB asked the Court to draw an adverse inference against LCI because Ohana and Fernando threw away LCI's remaining inventory of Maximum Impact-labeled canisters upon learning of the State wrongful-death lawsuit.

### A.    Physical Evidence and Documents

The physical evidence admitted at trial falls loosely into five groups.

First, evidence of the Maximum Impact trademark.  The U.S. Patent and Trademark Office issued a trademark to AFAB for "Maximum Impact."  The trademark covers a "personal lubricant," "body paint," "energy pills," and the purported "aerosol cleaner."  J-18 at 0001; LCI-07.  Photos of these products show (1) a Maximum Impact "liquid latex body cosmetic"; (2) a "premium" silver canister of Maximum Impact cleaning solvent; (3) a silicone-based Maximum Impact lubricant with "longer lasting" and "easy cleanup" on the label; (4) a separate Maximum Impact silicone-based lubricant; (5) a Maximum Impact bottle of pills called "Mindscape"; and (6) a Maximum Impact bottle of pills that simply says "Energy" below a misspelled "Maximum Impact," written as "Maxiumm Impact."  *See* LCI-07.

Second, the two canisters labeled Maximum Impact that Ravi Gopaul found near Steven Gopaul (the "Gopaul Canisters").  J-19, J-20.  These are two silver canisters with the text "Maximum Impact" on their label in black.  The labels do not mention either AFAB or S.V.T.; rather they are labeled as from an entity called "Maximum Impact Solvents."  Neither canister

5

presently has a cap, although Ravi Gopaul testified that the Maximum Impact he or Steven purchased at LCI always had a cap.  A silver ring sits at the top of the canisters parallel to their bottoms, and a white nozzle (sometimes called a "valve" or "actuator") with a generally conical shape sits inside that ring.

Third, the AFAB-proffered evidence purporting to show the features of genuine Maximum Impact.  All such evidence, other than the photos accompanying the Maximum Impact trademark, came solely through AFAB's owner, Everett Farr.  The evidence includes two black plastic caps that Farr testified would be on any genuine Maximum Impact canister, AFAB-19, AFAB-20, and one black plastic cap that was found on a counterfeit Maximum Impact canister unrelated to this case, AFAB-21.  AFAB also introduced a Maximum Impact canister that was seemingly taken from an AFAB manufacturing line (the "Example Canister").  The Example Canister was never filled, sealed, topped with a valve or actuator nozzle, or circulated in the stream of commerce.  It is a small silver canister that is 4 ounces with black text that says, "Maximum Impact."  AFAB-18.  The top of the canister is completely open, with a golden ring around its top.  The back of the canister has text reading "S.V.T. INC."[6]  Next, AFAB introduced two demonstrative canisters of Maximum Impact that an expert (who did not testify at trial) made in December 2023 or 2024 for this litigation, purportedly using the AFAB assembly line equipment (the "Demonstrative Canisters").  AFAB-6.  The Demonstrative Canisters were never filled, nor entered in the stream of commerce, and do not have labels or printing of any kind. They are larger than the Example Canister (taller by close to an inch) and have silver rings at their tops.  One of the Demonstrative Canisters has a white plastic nozzle, which is slightly

---

[6] Farr testified that S.V.T. was a related or predecessor entity to AFAB, also owned and operated by Farr, and that S.V.T. merged into AFAB in 2010.  Farr also described S.V.T. as a "fictitious" name for AFAB.

different in shape than the nozzles on the Gopaul Canisters. The other Demonstrative Canister has no nozzle. Underneath where the nozzle would sit, there is a thin sheet of metal with five small dimples.

Fourth, text messages between Ravi Gopaul and Fernando from September 10, 2016, to February 6, 2019. J-27. These messages show that Ravi Gopaul asked Fernando in November 2017 about ordering "some stuff." J-27 at 0001. Ravi forwarded photos of several products and asked about others. Based on the text messages, Fernando delivered an order of products to Ravi outside a Starbucks in Midtown Manhattan in November 2017. *See id.* at 0005. The texts also show that Ravi asked about a sexual product called "Bruno" and "white label poppers" in December 2017 and that the two completed a second transaction, with delivery outside any physical store, in December 2017. *Id.* at 0008.

Fifth and last, voluminous records of Maximum Impact sales from AFAB to its distributors (LCI-1, J-34), from VDAN and E & A Video to LCI (J-44, J-44A, and J-45), and from LCI to its customers (J-42, J-43). The records from AFAB show that it sold thousands of canisters of Maximum Impact to multiple distributors across the nation. The invoices VDAN and E & A Video issued to LCI show that both wholesale distributors sold ample amounts of Maximum Impact to LCI. And LCI's customer receipts show that LCI sold ample amounts of Maximum Impact to its customers. A comparison of these distributor invoices to LCI's sales receipts shows that LCI purchased slightly more Maximum Impact from E & A Video and VDAN than it sold, at least based on receipts for purchases that are identified as Maximum Impact. A few sales receipts include entries denominated "custom items" without descriptions or product names. The prices of these custom items vary without a discernible pattern. LCI's sales receipts also show that LCI would typically sell a canister of Maximum Impact for $24.99 but

often would discount that price to $20 a unit.  LCI also sold other products for $24.99 that would at times be discounted to $20.

Two of LCI's receipts are especially important to this lawsuit.  A May 16, 2019 receipt shows a purchase of two canisters of Maximum Impact with $4.99 off on each, a purchase of "White Label" with $4.99 off, and several other products, for a total of $120.  *See* J-43 at 0012. The receipt does not identify the purchaser because he or she paid in cash.  *Id.*  But, as will be discussed later, two witnesses testified the likely purchaser was Steven Gopaul.  A May 22, 2019 receipt, meanwhile shows a purchase by Steven Gopaul for an $80 "custom item."  *Id.* at 0014.

### B.  Witness Testimony

Turning to the witness testimony, AFAB called two witnesses in its direct case:  Ravi Gopaul and AFAB's president and founder, Everett Farr.  LCI called three witnesses:  Ohana, Fernando, and Amy Mills, the president of E & A Video.  And VDAN called one witness:  its president Vadim Daysudov.  The Court summarizes the relevant aspects of each witness' testimony below.

#### 1.  Ravi Gopaul

AFAB's first witness was Ravi Gopaul.  Ravi testified that, in 2018 and 2019, Steven Gopaul used inhalants to get high and to enhance sexual intercourse, primarily used Maximum Impact as his inhalant of choice, and used inhalant products two or three times a month on average.  He testified that the Maximum Impact Steven Gopaul used "subtly" smelled in a way that Ravi would not describe as "terrible" or "awful," but confirmed the smell was not like that of a gas stove before it lights.  He also testified that the Maximum Impact near Steven Gopaul's body and in his bedside drawer was uncapped and could not recall seeing either canister's cap. But he testified Steven Gopaul would not have purchased uncapped Maximum Impact.

Next, Ravi testified that—although he was not always with Steven when Steven purchased Maximum Impact—he believed Steven would have purchased the Maximum Impact canisters from LCI. He testified the two would only purchase Maximum Impact from LCI, in part because of their relationship with Fernando, and that, as far as he knew, Steven had not bought Maximum Impact from any other place since LCI opened. Ravi also testified he managed the finances for their household and believed he was aware of all of Steven's transactions both because Steven would generally tell him about cash purchases and because he would review credit card statements. He also testified that, in the past, Steven told Ravi about shopping trips to LCI either before or after going, particularly if he was purchasing Maximum Impact. At one point, Ravi examined the LCI receipt from May 16, 2019, that totaled $120. Ravi testified that he believed the purchaser was likely his husband, Steven Gopaul, in part based on his recollection of text messages between him and Steven that day. Notably, Ravi testified that he did not know whether Steven went to LCI on May 22, 2019, and that Steven had not told him he was going there.

Ravi also testified at length about his relationship with Fernando. Ravi and Steven seemingly met Fernando while Fernando was employed at the Blue Store. After Fernando left the Blue Store, Ravi and Steven followed him to LCI to support him. AFAB introduced Ravi Gopaul and Fernando's text messages and asked about Fernando's sale of products to Ravi in November and December of 2017. Ravi Gopaul testified he did not know where Fernando obtained the goods that he sold in either November or December of 2017.

### 2. Everett Farr

AFAB then called its second and last witness: Everett Farr. Farr has owned AFAB since 1995 and testified that AFAB makes over one hundred and fifty products, including cosmetics, golf clubs, tofu, and food processors at its factory in Bensalem, Pennsylvania. He testified that

9

AFAB has a trademark in "Maximum Impact" that covers a cleaning solvent product and body paint.

Farr testified that he stopped selling the Maximum Impact trademarked "cleaning solution" in December of 2019 due to dropping demand and rising insurance costs for certain volatile organic compounds. He also testified that an entity called "S.V.T. Inc." was formed in the 1990s and merged with AFAB in 2010. He also described S.V.T. as a "fictitious name" for AFAB after the two's merger into AFAB. Prior to ending the sale of Maximum Impact cleaning solutions in December 2019, Farr testified, he sold some Maximum Impact aerosol canisters with S.V.T. on the label, although other canisters of Maximum Impact seemingly had "AFAB" on their labels. AFAB then introduced the Example Canister into evidence. Farr identified the Example Canister and testified that AFAB had changed its labeling in December 2017, although his testimony was unclear whether the Example Canister had labeling from before or after December 2017. The parties' joint exhibit list described the Example Canister as "AFAB cleaning solvent can from 2016." Dkt. No. 105.

Plaintiff then introduced AFAB-19, -20, and -21, which are three black plastic caps. Farr testified that AFAB-19 and -20 were genuine caps that were placed on top of Maximum Impact aerosol canisters. These caps have the text "Maximum Impact" printed on them. Farr then testified that AFAB-21 was a counterfeit cap. It bears the text, "Maxiumm Impact."

Next, Farr testified about a 2015 wrongful death action brought against AFAB in California after a man died after inhaling what Farr described as counterfeit Maximum Impact. After the California lawsuit, Farr testified, he realized there was a "potential for abuse" of his product. And he proceeded to testify as to several anti-counterfeiting steps he took in response.

10

First, he testified that he started using the caps that are AFAB-19 and -20, given that the California lawsuit involved a counterfeit cap with a typo like that in AFAB-21.

Second, he testified that he began adding a substance called butyl mercaptan to Maximum Impact. Farr described butyl mercaptan as a noxious substance. He was aware of it because he developed a rape-prevention ampoule containing butyl mercaptan that, if broken, released a noxious odor capable of dissuading a would-be rapist because butyl mercaptan smells so bad it could "empty a mall." Farr testified that AFAB began adding 10 to 30 parts per million of butyl mercaptan into Maximum Impact as early as 2016. If a person misused Maximum Impact containing butyl mercaptan (by inhaling it), Farr testified, they would become nauseous.[7] When asked whether adding butyl mercaptan to a product labeled as a cleaning solvent would affect its sales, Farr testified it did not affect Maximum Impact's sales.

Third, Farr testified that he began using a device called an "air actuated plunger" on his assembly line to "crimp" Maximum Impact aerosol containers in a distinctive way. As he explained it, the air actuated plunger applies pressure to the valves sitting atop Maximum Impact canisters, producing distinctive "crimping" patterns where the valve presses against an underlying sheet of metal. Farr testified that the two Demonstrative Canisters, AFAB-6, were created by an expert hired for this litigation who used the AFAB assembly line, including the special air actuated plunger. He identified the dimpling pattern on one of the Demonstrative Canisters as indicative of the distinctive "crimping" on genuine Maximum Impact canisters. He also testified that, as a general matter, the air actuated plunger was used on all Maximum Impact

---

[7] *See also* OCCUPATIONAL SAFETY & HEALTH ADMIN., BUTYL MERCAPTAN (BUTANETHIOL), https://www.osha.gov/chemicaldata/102 [https://perma.cc/T8RJ-D9AV] (last visited February 20, 2026) (explaining that Butyl mercaptan is a "[c]olorless liquid with a strong, garlic-, cabbage-, or skunk-like odor.").

11

canisters before they left the manufacturing line.  Farr testified that the two Demonstrative Canisters were made in his factory in December of 2023 or 2024, four to five years after he claimed AFAB had stopped making or selling Maximum Impact aerosol canisters.

Farr then testified about other features of genuine Maximum Impact besides the three discussed above (caps, butyl mercaptan, and crimping).  Farr testified that, starting in 2016, genuine Maximum Impact had a series of numbers printed on it by an ink jetting machine, typically on the bottom of the canister.  He also testified that genuine Maximum Impact had a nozzle like that on one of the Demonstrative Canisters.

AFAB's counsel then asked Farr to examine the two canisters found near Steven Gopaul. Farr testified he did not believe either was genuine Maximum Impact because they lacked caps, a distinct numerical code printed on them, and a distinctive butyl mercaptan smell.  He also testified that the Gopaul Canisters had differently-shaped nozzles than the nozzle on genuine Maximum Impact.  Next, Farr testified that, while in the office of Ravi Gopaul's counsel, he was able to remove the plastic nozzle from one of the canisters and confirm it lacked crimping underneath.  And Farr testified that the entity identified on the canisters' label, "Maximum Impact Solvents," was not a name that AFAB had ever used in association with the product and was not the name of a genuine distributor.

Finally, Farr testified that (1) when he received notice of Gopaul Action he did not have any Maximum Impact canisters because he stopped selling them in December 2019; and (2) both VDAN and E & A Video were legitimate Maximum Impact wholesale distributors, but he stopped selling to them in late 2019.

### 3.  Michael Ohana

Defendant LCI then called its first witness, Michael Ohana.  Ohana has been the owner of LCI since it opened in 2018.  He testified that, starting in 2019, LCI recorded sales using a point-

12

of-sale system called Clover. All employees used Ohana's login information on Clover until 2021, meaning all receipts from the Clover system until 2021 report the cashier as "Michael."

Ohana testified that Fernando was the store manager, from the time that LCI opened until the present. As such, Fernando was responsible for handling inventory, ordering products, and finding distributors. Ohana, meanwhile, was responsible for things like deciding what product mix the store would carry and paying bills. Ohana knew that LCI purchased Maximum Impact from E & A Video and VDAN. Ohana then identified joint exhibits J-44, J-44A, and J-45 as invoices from E & A Video and VDAN to LCI for Maximum Impact and other products. He testified that, in 2019, he was not purchasing Maximum Impact from any distributor besides VDAN or E & A Video. VDAN was LCI's "main distributor" of Maximum Impact, Ohana testified, because any Maximum Impact LCI needed, it would order from VDAN. LCI would order from E & A Video, he testified, only if VDAN had no Maximum Impact in stock.

AFAB's counsel questioned Ohana extensively about why he and Fernando threw out LCI's Maximum Impact after notice of Ravi Gopaul's lawsuit. Ohana testified that he made the decision to throw out the Maximum Impact and "related products" because he received a court filing stating the products had harmed someone and he did not want to sell products that could hurt people. He described the decision as one made from emotion, in the moment. Ohana recalled products called Blue Label and Rush, as well as "nail polish removers" as among the liquid products that they also threw away as being similar to Maximum Impact. He estimated that he threw away about 12–13 canisters of Maximum Impact and 20–25 vials of similar liquid products.

Finally, Ohana testified that many items at LCI were labeled with a price gun—a handheld device that printed prices on small rectangular colored stickers that could be affixed

13

rapidly by the price gun to products or their tags. He believed that the Maximum Impact sold at LCI would have been stickered with the price gun with a $24.99 price. The Clover system could scan barcodes on some items to determine their price; for other items they might have a barcode taped near the register that could be scanned; and for other items the cashier could type the name of the product into a search bar and the price would appear.

### 4. Amy Mills

LCI next called the President of E & A Video, Amy Mills. She testified that E & A Video is a wholesale distributor located in New Jersey that had purchased "nail polish remover" and "cleaning solvent" from AFAB. The "nail polish remover" was called "Jungle Juice." The "cleaning solvent" was Maximum Impact. Her point of contact at AFAB was Everett Farr. Mills testified she only purchased Maximum Impact from AFAB and did not keep a backstock (in other words, she ordered more product from AFAB when she received an order from a retail customer). Mills identified LCI as one of her previous customers for products including Maximum Impact.

In surprising testimony, at least to the Court in light of Farr's testimony that AFAB ceased manufacturing or selling Maximum Impact in late 2019, Mills testified she was currently selling Maximum Impact and had sold it to customers as recently as the week before trial. She testified that E & A Video no longer sells to retail customers in New York City but continues selling to many stores in New Jersey and other places. Asked for an example of her current customers, Mills cited the "adult entertainment" chain store "Romantix." Asked about her current source for Maximum Impact, Mills testified that Farr called her and instructed her to begin purchasing Maximum Impact from a company called ACME instead of directly from AFAB. She could not recall when the phone call occurred.

14

AFAB's counsel cross-examined Mills. Mills testified that her understanding is that ACME is also located in New Jersey and is a distributor of AFAB products. AFAB's counsel asked, when Mills purchased from ACME, whether it was the same product or manufactured by someone else, and Mills responded it was the same product. The Court then inquired whether ACME was just the new middleman, and Mills affirmed.

### 5. Dominguez Fernando

After Ohana, LCI called Dominguez Fernando, the manager of LCI. Fernando testified extensively about LCI's Maximum Impact acquisition and shelving process. Fernando ordered Maximum Impact from VDAN by phone and would do so whenever LCI's stock began to run low. He always went to VDAN first because it could make same-day deliveries. If VDAN did not have stock, Fernando would call E & A Video to make a purchase. Fernando also testified that VDAN and E & A Video were LCI's only Maximum Impact suppliers.

The Maximum Impact would come in a box from either distributor. The product itself was a silver canister with black letters and a black cap. Fernando could not recall any stickers on the canisters when he received them, from either distributor.

After receiving an order of Maximum Impact, Fernando or another employee would enter the new stock into the Clover system. They would then add a price sticker to the canisters, using the price gun, and place them on the shelf. LCI did not have a storeroom, so all Maximum Impact inventory would go on the shelf after receipt.

On cross-examination, Fernando testified that he worked at the Blue Store but left in about November 2017 to help Ohana open LCI, which opened to customers in March 2018. Ohana paid Fernando during this time. Fernando testified that he did not have any "personal customers" and only sold products from the Blue Store or from LCI. Looking at his text message exchanges with Ravi Gopaul, Fernando testified that he got the products for the

15

delivered sales either from the Blue Store or from VDAN after he left the Blue Store and was helping Ohana set up LCI.  When asked if VDAN sold to him personally, he said no and mentioned buying via an invoice that he believed was paid by Ohana.  Regarding the "Bruno" product referenced in the text messages, however, Fernando testified he would have acquired the product directly from Bruno's manufacturer.

After asking about Fernando's deliveries to Ravi Gopaul in 2017, AFAB's counsel asked Fernando at length about LCI's receipts.  Looking at the May 22, 2019 receipt for the $80 "custom item" for Steven Gopaul, Fernando testified that the "custom item" was likely Maximum Impact because Steven Gopaul always purchased Maximum Impact.  Fernando was not working at LCI that day, so he could not be sure who the cashier was on the sale.  Looking at the May 16, 2019 receipt showing a purchase of two canisters of Maximum Impact but no customer name, Fernando testified the "customer" was likely Steven Gopaul.  He explained that the customer was likely Steven Gopaul because the receipt shows a discount of $4.99, consistent with the discount LCI gave Steven Gopaul, and the items on the receipt were consistent with Steven Gopaul's purchasing patterns.

VDAN's counsel's cross-examination focused on the invoices from E & A Video and VDAN to LCI, and LCI's receipts.  Fernando once again testified that he only purchased Maximum Impact from one of those two distributors and would only order more Maximum Impact when LCI's supply was running low.  He reiterated that, once received, all LCI's Maximum Impact went directly to the shelf for sale.

Next, VDAN's counsel elicited testimony challenging that Steven Gopaul was the customer on the May 16, 2019 receipt, or that Steven Gopaul purchased Maximum Impact on May 22, 2019.  Looking at a variety of receipts shown to him by VDAN's counsel, Fernando

16

confirmed that many LCI customers besides Steven Gopaul received the $4.99 discount on Maximum Impact as well as other items.  Fernando then confirmed, through exemplar receipts, that LCI sold many items priced at $24.99 and that, when given the $4.99 discount provided to many customers, those items cost $20.  Counsel then elicited that at least one receipt had both "custom order" and Maximum Impact as separate entries.  Counsel then showed Fernando multiple receipts of the Gopauls' purchases at LCI that did not include Maximum Impact.

VDAN's counsel next walked Fernando through the invoices from the two identified suppliers during April and May 2019.  Fernando confirmed that there were no deliveries of Maximum Impact to LCI from VDAN after April 5, 2019, until May 17, 2019, and that in the interim period there were numerous orders of Maximum Impact from E & A Video.  Fernando confirmed that that pattern meant that VDAN did not have Maximum Impact in stock and so he would then order from E & A Video instead.

Finally, Fernando testified that he had never seen exhibit J-50 (a barcode sticker from VDAN) on any Maximum Impact cans, whether ordered from VDAN or elsewhere.

### 6.  Vadim Daysudov

Next, VDAN called its first and only witness: Vadim Daysudov, the owner of VDAN. He testified that VDAN distributes many "adult novelty items" and VDAN has sold these types of items for as long as Daysudov could remember.  He testified that VDAN started selling Maximum Impact in 2015 after VDAN acquired a retail store in Chelsea called "Erotica." Erotica had already been selling Maximum Impact and Daysudov testified that VDAN wanted to "keep the sales going."  He testified that he acquired Maximum Impact exclusively from S.V.T., which he also testified was the same entity as AFAB.  If AFAB was out of stock, Daysudov testified, then VDAN would not re-supply until AFAB had replenished its stock.

Daysudov also testified that, starting in 2016 or 2017, it was VDAN's regular practice to place barcode stickers on the bottom of all Maximum Impact canisters after receiving them from AFAB, by opening the case of 64 from the bottom, stickering all the cans at once onto their concave bottoms, and then closing the case back up.  They began this practice once they had their own retail store, and it was more efficient to simply sticker all of the canisters of Maximum Impact, even if some would be sold to other retail stores.  He identified J-50 as a partially used sheet of VDAN's barcode stickers for Maximum Impact.  Anecdotally, he testified he once tried peeling off the barcode sticker but could not.

On AFAB's cross-examination, Daysudov testified that all VDAN's sales to LCI were delivered directly to its location in Chelsea.  He testified that he never sold to Fernando personally in 2017 or 2018.  Lastly, Daysudov testified that VDAN sold certain products to a person named Rafi who owned a distribution company called RAS Distribution; those products did not include Maximum Impact.

### 7.  Everett Farr (Rebuttal)

After Daysudov's testimony, AFAB re-called Farr as a rebuttal witness.  Farr testified that in the past AFAB sold Maximum Impact to RAS Distribution and that Farr knew the owner, whose name was Rafi and who owned the Blue Store.  Farr testified that Rafi stopped buying Maximum Impact from AFAB at some point in 2016.  He also testified that no authorized distributor sold AFAB Maximum Impact to the Blue Store after RAS stopped buying.  When asked how he knew, he testified that he only had four or five distributors and, after the 2015 lawsuit in California, he started keeping closer tabs on the retail locations that sold Maximum Impact, by making his distributors provide him with a list every three months of their retail customers for Maximum Impact.

18

Farr also confirmed that he called Mills and told her she should start ordering Maximum Impact from ACME.  He explained that ACME is an authorized AFAB distributor.  He explained further that Mills would energetically call him telling him that she needed more products and he thought that ACME, which was set up as a distributor, could provide her with better and faster service, and it also would relieve the burden on AFAB of servicing a demanding customer.  When the Court asked how Mills was presently getting Maximum Impact from ACME given Farr's testimony that AFAB had stopped making Maximum Impact in 2019, Farr testified that initially ACME was a distributor for AFAB-manufactured product, but that when Farr decided to stop manufacturing Maximum Impact aerosol in December 2019, he sold the rights to ACME to manufacture Maximum Impact aerosol.  The rights transferred on January 1, 2020, and ACME has been making and selling the product since early 2020.

## LEGAL BACKGROUND

Courts apply a two-step legal test to analyze trademark infringement claims under the Lanham Act.  *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 421 (2d Cir. 2018). [8]  At step one, a court determines whether a trademark is entitled to protection.  *Id.*  A mark that is "inherently distinctive" is entitled to protection.  *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt, Inc.*, 192 F.3d 337, 344 (2d Cir. 1999).  A court presumes a mark is "inherently distinctive," and therefore entitled to protection, if it is registered with the Patent and Trademark Office ("PTO").  *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076–77 (2d Cir. 1993); *Lane Cap. Mgmt., Inc.*, 192 F.3d at 345.  A defendant may rebut the presumption that a registered trademark is "inherently distinctive" by a preponderance of the

---

[8] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

evidence. *Lane*, 192 F.3d at 345; *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir. 1990).

At step two, a court determines whether consumers are likely to be confused by the infringing product. *Excelled Sheepskin & Leather Coat Corp*, 897 F.3d at 421. Courts in the Second Circuit assess whether an infringing use of a mark is likely to cause consumer confusion by applying the eight *Polaroid* factors. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495–96 (2d Cir. 1961); *1-800 Contacts, Inc. v. JAND, Inc.*, No. 22-1634, 119 F.4th 234, 247 (2d Cir. 2024). Under a counterfeit theory of trademark infringement, however, a court need not analyze the *Polaroid* factors if a plaintiff can show (1) a good is counterfeit; and (2) a defendant sold the counterfeit. *Chanel, Inc. v. RealReal Inc.*, 449 F. Supp. 3d 422, 438 (S.D.N.Y. 2020). "A product is deemed counterfeit if it contains an original mark that is likely to deceive the public as to its origin." *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 525 (S.D.N.Y. 2019) (quoting *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 169 (S.D.N.Y. 2007)). As plaintiff, AFAB bears the burden of proving its case by a preponderance of the evidence. *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 232 (S.D.N.Y. 2013).

## DISCUSSION

AFAB has shown that it has registered the trademark "Maximum Impact" with the PTO, specifically for use on an ethyl chloride aerosol product, and therefore a presumption attaches that "Maximum Impact" is inherently distinctive and entitled to protection. *Gruner + Jahr USA Pub.*, 991 F.2d at 1076–77. Neither LCI nor VDAN have rebutted that presumption (nor attempted to). Accordingly, the Court finds that AFAB has satisfied the first step of its Lanham Act claim.

That leaves the second step.  AFAB did not argue any of the *Polaroid* factors at trial nor did it adduce evidence necessary for the Court to weigh these factors.  Instead, it made clear that it was proceeding on a counterfeit theory of liability.  Therefore, AFAB needed to show that (1) the Maximum Impact canisters found near Steven Gopaul were counterfeit; and (2) LCI sold them.  The Court finds that AFAB has not carried its burden of showing either.

## I.    AFAB HAS NOT CARRIED ITS BURDEN

### A.  Lack of Evidence

At the outset, the Court notes the sparse evidence Plaintiff adduced about the features of "genuine" Maximum Impact.  Besides Farr, AFAB did not call any witness on this score.  AFAB did not introduce a single genuine canister of Maximum Impact that circulated in the stream of commerce or that had all the purported features of "genuine" Maximum Impact that was in commerce in or around May 2019.  Instead, Plaintiff's entire case rested on the testimony of Farr, a plainly interested witness.  On several key points, the Court did not find his testimony credible.

### 1.  Farr Was Not a Credible Witness on Key Points

Farr testified he became aware of Maximum Impact's potential for "misuse" (presumably referring to use as an inhalant) in 2015 after the California state lawsuit.  And he purportedly took steps to prevent counterfeiting given his alleged concern about that misuse.  That narrative and Farr's claimed concern are starkly contradicted by the record.  Consider first the products that the "Maximum Impact" trademark covers:  personal lubricants, body paint, "energy" pills, and a purported aerosol cleaner.  LCI-07.  The grouping of these products suggests Farr was aware of the actual consumer base for Maximum Impact.  Consider next Maximum Impact's distributors and their clients.  Farr testified that AFAB had only four or five distributors for Maximum Impact, including VDAN and E & A Video.  Daysudov testified that VDAN sold

21

"adult novelty items" for as long as he could remember.  Mills, meanwhile, testified that "E & A Video" sold to sex shops and other "adult entertainment" retailers.[9]  Next, the branding of the other products AFAB sold to its distributors confirms AFAB was aware of the sexual uses of its products.  For example, Mills testified that, in addition to purchasing "Maximum Impact" from AFAB, E & A Video purchased a "nail polish remover" called "Jungle Juice" and another called "Rush."  Having observed Farr's trial testimony, the testimony of the other witnesses, and the other evidence introduced at trial, the Court would be hard pressed to find that Farr innocently became aware of Maximum's Impact's potential for "misuse" in 2015 despite the ample evidence to the contrary, or that he changed the sales or marketing practices of the product thereafter.[10]

That brings us to the alleged anti-counterfeiting measures that Farr testified AFAB took following the California action.  First, adding caps with "Maximum Impact" written on them.

---

[9] Recall also that, after 2015, Farr testified he made his distributors provide him a list of their retail clients every three months.  The evidence adduced at trial showed that the retail clients included multiple sex shops.  There is not even a suggestion that Farr took any action in response.  Therefore, it is not credible that Farr was concerned about, let alone took action to prevent, "misuses" of Maximum Impact.

[10] Although it plays no role in the Court's reasoning or conclusions, the Court notes that news articles about 'poppers' have referenced Farr by name and noted his prominent role in the illicit market, in stark contrast to his testimony at trial.  *See* David Mack, *This Man Does Not Make Poppers*, BUZZFEEDNEWS (July 27, 2021), https://www.buzzfeednews.com/article/davidmack/poppers-factory [https://perma.cc/N79S-3MRT] (last visited February 27, 2026).  This article includes the subhead "For decades, poppers have been the go-to sex drug for gay men.  But where do they come from?"  The online version of this article includes multiple professional photographs of Everett Farr, whom the Court can recognize from his presence in court during the trial and his testimony, including one in which he is holding up a small liquid vial labeled "Rush" in each hand (one of the AFAB products that Mills testified she sells to various adult entertainment stores, and that Fernando testified they used to carry at LCI).  The Court may take judicial notice of "of the *fact* that press coverage . . . contained certain information, without regard to the truth of their contents."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  To be clear, the Court does not rely on any information in these articles for its truth or for any of the conclusions in this Opinion.

22

Second, adding butyl mercaptan to the product. And third, using a specially-designed manufacturing tool to secretly "crimp" genuine Maximum Impact.

At trial, AFAB introduced three Maximum Impact caps. The first two were purportedly genuine and said, "Maximum Impact," the third was one that one of AFAB's distributors provided and had text reading, "Maxiumm Impact." These caps are not probative evidence. Ravi Gopaul could not locate the caps for the Maximum Impact found near Steven Gopaul. Therefore, these caps cannot help the Court determine if the Maximum Impact canisters found near Steven Gopaul were counterfeit. Furthermore, a photo of Maximum Impact energy pills called "Energy" admitted into the record bears the exact same misspelling of "Maxiumm Impact" as the allegedly counterfeit cap AFAB introduced. *Compare* LCI-08 (showing a photo of energy pills with text stating "Maxiumm Impact"); *with* AFAB-21 (a cap with text reading, "Maxiumm Impact"). This evidence is, at best, neutral.

Next, Farr testified that he added butyl mercaptan to Maximum Impact starting in 2016 to prevent counterfeiting and stop its misuse. The Court seriously doubts the accuracy of this testimony. Farr testified that butyl mercaptan has a noxious and horrible odor so vile that even in small amounts it could clear a mall or prevent a sex crime. Nevertheless, he also testified that adding this substance to his purported "cleaning solvent" did not deter purchasers or reduce sales. He testified that intentionally inhaling Maximum Impact containing butyl mercaptan would cause someone to be extremely nauseous. But AFAB's invoices show it sold thousands of units of Maximum Impact, including to VDAN and E & A Video, after 2016. *See* LCI-01, J-34. VDAN and E & A Video then sold Maximum Impact primarily or exclusively to sex shops, where it was seemingly exclusively used as an inhalant (certainly the record contains no evidence of the product being used to clean anything). Furthermore, by all accounts, Maximum

23

Impact was flying off the shelves.  Indeed, Farr at one point testified that Mills would call him in an excited state demanding more Maximum Impact, which is purportedly why Farr directed her to start using ACME as a distributor.  LCI's witnesses similarly testified that if VDAN did not have Maximum Impact in stock, they would order from E & A Video rather than risk not carrying the product.  Therefore, it is not credible that AFAB was adding a discernible foul-smelling and nausea-inducing substance to Maximum Impact starting in 2016, to deter use as an inhalant, when the clear evidence shows that Maximum Impact continued to enjoy strong sales at sex shops as an inhalant.

Besides the caps and butyl mercaptan, Farr testified that AFAB began "crimping" Maximum Impact to mark it as genuine.  The record lacks a single example of "genuine" Maximum Impact that entered the stream of commerce and has the "crimping" Farr identified.  A non-testifying expert produced the Demonstrative Canisters showing the crimping in a factory in 2023 or 2024, years after AFAB purportedly stopped manufacturing Maximum Impact and even longer after Steven Gopaul purchased the canisters found near him in May 2019.  And the Example Canister is missing its top and valve entirely.  It is also worth noting that the Example Canister purportedly taken from the manufacturing stock and the Demonstrative Canisters meant to represent genuine Maximum Impact are different sizes, with the Demonstrative Canisters being noticeably taller.  Furthermore, while the Demonstrative Canisters have silver rings on their tops, the Example Canister has a golden ring.  Ironically, the Demonstrative Canisters have dimensions and structural features that are more similar to the allegedly counterfeit Gopaul Canisters than they are to the Example Canister.

Farr also testified that the Maximum Impact found near Steven Gopaul has a different nozzle than genuine Maximum Impact.  But, again, AFAB has not produced a *single* "genuine"

canister of Maximum Impact that was circulated in commerce (or even intended to be circulated in commerce) containing what AFAB alleges are features of "genuine" Maximum Impact. The Example Canister also has no valve or nozzle at all.

Next, Farr highlighted the Maximum Impact found near Steven Gopaul has a label identifying Maximum Impact Solvents as the manufacturer, which Farr stated is not a valid company. But it is unclear whether AFAB has produced any example of a label that would be on genuine Maximum Impact from 2019. The Demonstrative Canisters lack a label. And the Court is skeptical about the probative value of the Example Canister. On the parties' joint exhibit list, the Example Canister is described as "AFAB cleaning solvent can from 2016." *See* Dkt. No. 105. If the Example Canister is from 2016 and AFAB changed its labeling in December 2017, however, then the Example Canister's label would not be indicative of a label on "genuine" Maximum Impact from 2019. Even if the Example Canister was produced after December 2017, the Court has no insights into how AFAB procured the Example Canister except that it seemingly came from Farr, whom the Court does not deem credible on the question of identifying counterfeits. Furthermore, the Example Canister has on its label (seemingly as the manufacturer) "S.V.T. INC.," an entity that Farr testified had merged into AFAB in 2010 and described as a "fictitious" entity. A label identifying a fictitious entity as the product's manufacturer is not a credible example of a "genuine" product that the Court can use as a reference in determining whether the Gopaul Canisters are counterfeit.[11]

AFAB's failure to produce any canisters of Maximum Impact containing the features of "genuine" Maximum Impact brings us to the next major reason the Court did not find Farr

---

[11] The Court also notes that the Example Canister lacks the ink-jetted numerical code Farr testified AFAB started printing on Maximum Impact in 2016.

credible as to counterfeiting.  Throughout his initial testimony, Farr gave the Court the false impression that all manufacturing of Maximum Impact ceased in late 2019.  Indeed, he testified that AFAB did not have any canisters of Maximum Impact because they stopped selling it in December 2019.  During Mills' testimony, however, it came to light that at some point Farr had called and instructed her to start making Maximum Impact purchases from a distributor called ACME, rather than from AFAB directly, and that E & A Video had sold Maximum Impact as recently as the week before trial.  Neither Mills or Farr could place when this call had occurred.

Plaintiff's counsel asked Mills whether she understood the Maximum Impact coming from ACME to still be coming from the same manufacturer and be the same product, and she said yes.  Only when the Court asked Farr directly during his rebuttal testimony about the apparent contradiction did he then explain for the first time that AFAB transferred ACME the right to manufacture Maximum Impact aerosol product after December 31, 2019.  The Court finds it highly suspicious that Farr never mentioned that ACME was distributing and manufacturing Maximum impact *to this day* until confronted with the testimony of Amy Mills and a direct question from the Court.[12]  Furthermore, although he testified that AFAB stopped manufacturing Maximum Impact due to dropping demand and rising insurance costs, it is unclear why it would remain lucrative for ACME to continue manufacturing and distributing Maximum Impact such that AFAB could sell the rights and ACME would still be in the Maximum Impact business six years later.

---

[12] It also bears mentioning that AFAB had consistently voiced its intent to call Mills as a witness, including during the Final Pre-Trial Conference just one week before trial.  Nevertheless, on the Thursday before trial, AFAB's counsel emailed the Court and all parties stating AFAB belatedly decided not to call Mills as a witness after all, forcing LCI to rush to secure her presence at trial.  Mills was clearly a friendly witness to AFAB—she and Farr both spoke positively about each other on the stand and when Mills was leaving the witness stand, Farr (present as a party-representative) gave her a generous wave.

Based on these and numerous other contradictions in his testimony as well as the Court's first-hand observations of him throughout the trial, the Court determines that Farr was not a credible witness on the question of the alleged counterfeit nature of the Gopaul Canisters.

### 2. Credible Testimony and Corroborated Evidence Indicates that LCI Was Not Selling Counterfeit Maximum Impact

Finally, putting aside Farr's non-credible testimony, the corroborated evidence in the record and credible testimony overwhelmingly reflects that, during the relevant period in the spring of 2019, LCI was selling "genuine" Maximum Impact that came from AFAB. That evidence cannot be reconciled with AFAB's claim that the Gopaul Canisters are counterfeit and were sold by LCI.

Witnesses from VDAN and E & Video both testified that VDAN and E & A Video purchased Maximum Impact from AFAB, exclusively. The Court found both witnesses highly credible. Farr testified that both companies were authorized distributors of Maximum Impact from AFAB, and AFAB's counsel affirmed on the record that AFAB did not dispute that VDAN and E & A Video sold only genuine Maximum Impact.

Next, Fernando and Ohana testified they purchased Maximum Impact exclusively from VDAN and E & A Video. Based on its first-hand observation of these witnesses, the Court found both witnesses highly credible in this regard, at least concerning the period from March 2018 onward. Furthermore, undisputed documentary evidence corroborates Fernando and Ohana's testimony. Invoices from VDAN and E & A Video show that both distributors were selling ample amounts of Maximum Impact to LCI. *See* J-44, J-44A, J-45. Sales receipts from LCI show that LCI did not sell more Maximum Impact than it purchased from VDAN and E & A

Video.[13] *See* J-42, J-43, AFAB-17, LCI-12. When the sales receipts showed stock was dwindling, a new invoice from VDAN or E & A Video showed that LCI was turning to either entity to replenish. The match between this evidence is entirely consistent with Ohana and Fernando's testimony that they purchased Maximum Impact only from VDAN and E & A Video.

Therefore, the Court finds as a proven fact that (1) VDAN and E & Video purchased Maximum Impact only from AFAB; and (2) LCI purchased Maximum Impact only from VDAN and E & A Video since its opening in March 2018. The only logical inference, therefore, is that the Maximum Impact on LCI's shelves in April and May of 2019 came from AFAB.

AFAB attempts to argue that Fernando or Ohana had some Maximum Impact shadow supplier. But there is no credible evidence for that theory.[14] When Fernando arranged the November 2017 transaction with Ravi Gopaul, he was still working at the Blue Store. The December 2017 transaction, meanwhile, did not involve Maximum Impact.[15] Even if the Court

---

[13] LCI in fact purchased slightly more than it sold, but the discrepancy is easily explainable by factors such as theft, employee usage, natural spoilage in the event a canister was damaged in store and needed to be thrown away, and Maximum Impact presumably being included in some "custom orders." Indeed, after LCI adopted the Clover POS system to track inventory and sales in early 2019, the order numbers from VDAN and E & A Video almost exactly align with LCI's sales, with slightly more ordered than sold. Certainly the evidence offers no support whatsoever for AFAB's theory that LCI had some other secret supplier of counterfeit Maximum Impact in the spring of 2019. As an aside, LCI sold more Maximum Impact in 2021 than it bought in 2021, but this stems from LCI selling some Maximum Impact in 2021 that it purchased during 2020.

[14] Farr testified that he knew AFAB was not distributing Maximum Impact to the Blue Store after 2016, hence seemed to suggest that Ohana and Fernando were ordering Maximum Impact from somewhere else while at the Blue Store. Even if it were relevant to the question of where LCI got its inventory from in 2019, the Court would give it little weight. Furthermore, Ohana testified that the Blue Store's stock came from a warehouse the Blue Store's owner had, where he maintained backstock of the Blue Store's products.

[15] The transaction involved a product named "Bruno" and "white labels poppers." Fernando testified that he would have purchased "Bruno" directly from Bruno's company. The source of the "white labels poppers," while unclear, does not suggest Fernando had some shadow supplier for counterfeit goods generally, and certainly not for Maximum Impact specifically. "White labels poppers" are a

assumed Fernando had a shadow Maximum Impact supplier that he used before starting at LCI in March 2018, the record is clear that LCI did not need a shadow supplier. Invoices from VDAN and E & A Video show LCI was already making ample purchases of Maximum Impact from them. Receipts from LCI show where the product was going. And, when the product ran low in the store, the evidence and testimony presented at trial showed that LCI would then make new purchases from the authorized distributors and receive that stock promptly (typically the same day or the following day).

In summary, corroborated objective evidence and credible testimony from numerous witnesses indicates that LCI was purchasing genuine Maximum Impact, particularly during the Spring 2019 period that is relevant to this case. AFAB has not shown that LCI was purchasing Maximum Impact from any sources besides AFAB's own authorized distributors, who undisputedly did not deal in counterfeit merchandise. And it has not introduced credible or corroborated evidence sufficient for the Court to distinguish between genuine and counterfeit Maximum Impact sold in 2019, or conclude by a preponderance of the evidence that the Gopaul Canisters were counterfeit. The sole witness on this score, Everett Farr, was not credible on several key points. Therefore, because whatever evidence exists as to counterfeiting either is not credible, is thin, or cannot be reconciled with other corroborated and credible evidence in the case, the Court determines that AFAB has not carried its burden of showing that the Gopaul Canisters are counterfeit.[16]

---

different product than Maximum Impact. *See* J-42 at 023 (showing "White Label" and Maximum Impact coded separately on a LCI receipt)

[16] If the Gopaul Canisters had been shown to be counterfeit, the Court would nonetheless have to conclude that AFAB has not shown that LCI sold them. The Court already found that, at least in the Spring of 2019, LCI purchased Maximum Impact only from authorized distributors that, in turn, purchased Maximum Impact only from AFAB. If the canisters were counterfeit, the logical inference is that they did not come from LCI. Furthermore, VDAN's cross examination of Fernando showed that multiple customers received the consumer discount, therefore neither the discount on the May 16, 2019

## II.    THE COURT WILL NOT DRAW AN ADVERSE INFERENCE AGAINST LCI

AFAB next argues that spoliation applies because Fernando and Ohana destroyed Maximum Impact on notice of the Gopaul action, and the Court should draw an inference that the Maximum Impact they destroyed was counterfeit.  The Court will not do so.

A party seeking an adverse inference must establish that the "destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).  The movant "must demonstrate not only that the spoliator destroyed 'relevant' evidence as that term is ordinarily understood, but also that the evidence it destroyed would have been of some 'assistive relevance' and favorable to the moving party's claims or defense." *Taylor v. City of New York*, 293 F.R.D. 601, 613 (S.D.N.Y. 2013).

AFAB has failed to show the relevance of the canisters that Ohana and Fernando disposed of in April 2021.  AFAB's theory is that the Gopaul Canisters were counterfeit and LCI sold Steven Gopaul those canisters in 2019.  As discussed at length, AFAB has not adduced sufficient evidence for the Court to determine what "genuine" Maximum Impact was in 2019 and it has failed to prove that the Gopaul Canisters were counterfeit.  Therefore, whether the canisters on LCI's shelves in April 2021 were the same as or different from those found in

---

transaction nor the product mix are dispositive evidence that Steven Gopaul was the mystery purchaser. VDAN's cross examination also showed that, on numerous instances, Steven Gopaul made purchases that did not include Maximum Impact, and, on at least one instance, "custom item" and Maximum Impact were separately coded on the same receipt.  Therefore, it is unclear whether Steven Gopaul was the customer on the May 16, 2019 receipt or whether Steven Gopaul's May 22, 2019 purchase at LCI for an $80 "custom item" was Maximum Impact.  Moreover, recall that Ravi Gopaul found only two canisters of Maximum Impact and the time between the May 22 purchase and Ravi Gopaul's discovery of his husband's unresponsive body was likely only enough time for Steven Gopaul to travel home from LCI, let the dogs out, and go upstairs to the bedroom.  If the $80 "custom item" corresponded to four canisters of Maximum Impact, then what happened to the remaining two canisters?  Nonetheless, because the Court finds that AFAB has not met its burden to show that the Gopaul Canisters were counterfeit, the Court need not conclusively resolve these issues.

30

Steven Gopaul's bedroom in May 2019, AFAB would likely still have failed to show the Gopaul Canisters were counterfeit.

Furthermore, AFAB claims that Steven Gopaul purchased canisters of Maximum Impact from LCI in May 2019. At that time, AFAB was producing "genuine" Maximum Impact. Ohana and Fernando disposed of their Maximum Impact canisters in April 2021, two years later, and nearly 18 months after AFAB claims it stopped manufacturing or distributing Maximum Impact. During April 2021, we now know, ACME was producing "genuine" Maximum Impact. AFAB has introduced no evidence about ACME's manufacturing practices or the appearance of their canisters or labels after they purchased the trademark rights from AFAB. Therefore, it is unclear whether the crimping, label, valve/nozzle type, or ink-jetted code that AFAB contends is indicative of genuine Maximum Impact even applies to Maximum Impact produced after December of 2019, when AFAB purportedly stopped manufacturing Maximum Impact.[17] As a result, the Court would lack any basis to assess whether the Maximum Impact on LCI's shelves as of April 2021 were counterfeit, even if it had the canisters. As a last resort, AFAB argued that if LCI had Maximum Impact from some other supplier who may be a counterfeiter on their shelves in April 2021, that could tend to show that they also carried counterfeit product in May 2019. Given the objective and corroborated evidence about LCI's inventory practices and supplier in Spring 2019, however, and the lack of any evidence that they were buying from a

---

[17] AFAB did not argue that a presumption of relevance applies and therefore has waived that argument. It is also less than clear the presumption would apply. Ohana and Fernando credibly testified they threw away their inventory of Maximum Impact because it had harmed someone. But, even if the presumption did apply, the Court finds that LCI has rebutted the presumption given its arguments highlighting the two-year gap in the evidence. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002) (discussing when relevance can be presumed); *Hawley v. Mphasis Corp.*, 302 F..R.D. 37, 49–50 (S.D.N.Y. 2014) (discussing when the relevance presumption may be rebutted).

31

black-market or counterfeiting source in 2021, this argument would not change the Court's determination, even if it could overlook the leaps of logic that would already be required.

### III.    LCI HAS NOT MET ITS BURDEN TO SHOW THAT VDAN SUPPLIED ANY MAXIMUM IMPACT LCI MAY HAVE SOLD TO STEVEN GOPAUL

The Court also finds that LCI failed to carry its burden of showing that the Gopaul Canisters or any Maximum Impact it may have sold to Steven Gopaul were supplied by VDAN, and accordingly VDAN must be dismissed from this case as a third-party defendant. Daysudov credibly testified that all VDAN-distributed Maximum Impact contained stickers with barcodes and that removing these stickers was difficult. Ravi Gopaul did not recall any stickers on the Maximum Impact found near Steven Gopaul. And there are no stickers on the Gopaul Canisters now in evidence.

Furthermore, the invoices show that E & A Video issued LCI an invoice on April 26, 2019, for sixty-four units of Maximum Impact. J-44A at 0029. E & A Video issued LCI another invoice for thirty-two units of Maximum Impact on May 20, 2019. J-44A at 0031. VDAN meanwhile issued LCI invoices for Maximum Impact on April 5, May 17, and August 2 of 2019. *See* J-45 at 0014–16. Fernando testified that he would order Maximum Impact orders only when LCI was running low. Therefore, if Steven Gopaul purchased the Gopaul Canisters on May 16, 2019 (or any time between April 27 and May 17), at LCI, then it is overwhelmingly likely that the Gopaul Canisters came from E & A Video. If he purchased the Gopaul Canisters on May 22, 2019, meanwhile (as explained above, it is not clear that anyone has shown by a preponderance that the product purchased on May 22 was Maximum Impact, much less the Gopaul Canisters), then it is at least equally if not more likely that they came from the May 20, 2019 order from E & A Video than from the May 17, 2019 VDAN order. In either scenario, LCI has failed to show by a preponderance of the evidence that if LCI sold the Gopaul Canisters then they were supplied by

32

VDAN.  Accordingly, since VDAN's liability in this case, if any, is as a third-party defendant and derivative of LCI's liability, judgment should be entered in favor of VDAN even if LCI had been found liable on AFAB's claims.

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of LCI as to AFAB's claims, and in favor of VDAN as to LCI's derivative claims against them.  The Clerk of Court is respectfully directed to close this case.

Dated: March 2, 2026
      New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge

# ATTACHMENT A

| Part I: Exhibits Used at Trial | |
|---|---|
| **Exhibit No.** | **Objection to Admission?** |
| J-1 | Y/N<br>Party:<br>Basis: |
| J-12 (pp 33-5) | Y/N<br>Party:<br>Basis: |
| J-16 (pp: 8-11, 25-26) | **Y**/N<br>Party: LCI<br>Basis: Irrelevant/Prejudicial |
| J-17 (pp: 18-19) | **Y**/N<br>Party: LCI<br>Basis: Irrelevant/Prejudicial |
| J-19 | Y/N<br>Party:<br>Basis: |
| J-20 | Y/N<br>Party:<br>Basis: |
| J-21 | Y/N<br>Party:<br>Basis: |
| J-27 | Y/N<br>Party:<br>Basis: |
| J-33 | Y/N<br>Party:<br>Basis: |

| | |
|---|---|
| J-34 | Y/N<br>Party:<br>Basis: |
| J-38 | Y/N<br>Party:<br>Basis: |
| J-41 | Y/N<br>Party:<br>Basis: |
| J-42 | Y/N<br>Party:<br>Basis: |
| J-43 | Y/N<br>Party:<br>Basis: |
| J-44 | Y/N<br>Party:<br>Basis: |
| J-44A | Y/N<br>Party:<br>Basis: |
| J-45 | Y/N<br>Party:<br>Basis: |
| J-50 | Y/N<br>Party:<br>Basis: |
| AFAB-6 | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1): Canisters never produced during discovery. |

| AFAB-12A | Y/N<br>Party:<br>Basis: |
|---|---|
| AFAB-12B | Y/N<br>Party:<br>Basis: |
| AFAB-13A | Y/N<br>Party:<br>Basis: |
| AFAB-14A | Y/N<br>Party:<br>Basis: |
| AFAB-14B | Y/N<br>Party:<br>Basis: |
| AFAB-18 | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1). |
| AFAB-19 | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1). |
| AFAB-20 | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1). |
| AFAB-21 | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1). |
| AFAB-22 | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1). |

| | |
|---|---|
| AFAB-23 | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1). |
| AFAB-24 (Also J-14)<br>(pp.1-25) | **Y/N**<br>Party: LCI<br>Basis: prejudicial |
| LCI-1<br>(As to Acme Products – pp: 4, 20, 32-33, 40, 49-50)<br>(As to RAS – pp: 31, 39, 56-7, 75-6, 106) | Y/N<br>Party:<br>Basis: |
| **Part II: Exhibits Not Used at Trial** ||
| **Exhibit No.** | **Objection to Admission?** |
| J-1 | Y/N<br>Party:<br>Basis: |
| J-2 | Y/N<br>Party:<br>Basis: |
| J-3 | Y/N<br>Party:<br>Basis: |
| J-4 | Y/N<br>Party:<br>Basis: |
| J-5 | Y/N<br>Party:<br>Basis: |
| J-6 | Y/N<br>Party:<br>Basis: |
| J-14 (13:10-14:8) | **Y/N**<br>Party: LCI<br>Basis: Prejudicial |
| J-28 | Y/N |

| | Party:<br>Basis: |
|---|---|
| J-29 | Y/N<br>Party:<br>Basis: |
| J-30 | Y/N<br>Party:<br>Basis: |
| J-31 | Y/N<br>Party:<br>Basis: |
| J-32 | Y/N<br>Party:<br>Basis: |
| J-33 | Y/N<br>Party:<br>Basis: |
| J-34 | Y/N<br>Party:<br>Basis: |
| J-35 | Y/N<br>Party:<br>Basis: |
| J-36 | Y/N<br>Party:<br>Basis: |
| J-37 | Y/N<br>Party:<br>Basis: |
| J-39 | Y/N<br>Party:<br>Basis: |
| J-40 | Y/N<br>Party:<br>Basis: |
| J-48 | Y/N<br>Party:<br>Basis: |
| AFAB-9 | **Y/N** |

|  | Party: LCI<br>Basis: Irrelevant |
|---|---|
| AFAB-10 | **Y/N**<br>Party: LCI<br>Basis: Irrelevant |
| AFAB-11 | **Y/N**<br>Party: LCI<br>Basis: Irrelevant |
| AFAB-17 (AFAB requests that this exhibit be considered only part of briefing, not substantive evidence) | **Y/N**<br>Party: LCI<br>Basis: Fed. R. Civ. Proc 37(c)(1) |
| LCI-7 | Y/N<br>Party:<br>Basis: |
| LCI-8 | Y/N<br>Party:<br>Basis: |
| LCI-12 | **Y/N**<br>Party: AFAB<br>Basis: Fed. R. Ev. 1006; Fed. R. Civ. P. 37 |